# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RENEE PAMELA RUSH,

      Plaintiff,

      vs.                                   Civ. No. 18-463 SCY

ANDREW SAUL, Commissioner of Social
Security,[1]

      Defendant.

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record filed

July 31, 2018, Doc. 12, in support of Plaintiff Renee Pamela Rush's Complaint, Doc. 1, seeking

review of the decision of Defendant Andrew Saul, Commissioner of the Social Security

Administration, denying Plaintiff's claim for disability insurance benefits under Title II and Title

XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. On November 5, 2018, Plaintiff filed her

Motion to Reverse and Remand for a Rehearing With Supporting Memorandum. Doc. 18. The

Commissioner filed a Brief in Response on February 1, 2019, Doc. 26, and Plaintiff filed a Reply

on February 19, 2019, Doc. 27. The Court has jurisdiction to review the Commissioner's final

decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record

and the applicable law and being fully advised in the premises, the Court finds the Motion is not

well taken and is **DENIED**.

---

[1] Andrew Saul was sworn in as Commissioner of the Social Security Administration on June 17, 2019 and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings and to enter an order of judgment. Docs. 4, 7, 8.

## I.      Background and Procedural Record

Claimant Renee Pamela Rush suffers from the following severe impairments: Obstructive sleep apnea; Cavernous angioma with associated headaches; Attention deficit disorder; Major depressive disorder; and Cognitive disorder, not otherwise specified. Administrative Record ("AR") at 14. She alleges that she became disabled as of January 5, 2008. *Id.* She completed one year of college and worked in the past as a sales associate and childcare provider. AR 154, 584-85.

On June 1, 2009, Ms. Rush filed concurrent claims of disability under Title II and Title XVI. AR 12. Her applications were initially denied on November 3, 2009 (AR 52), and upon reconsideration on April 23, 2011 (AR 53-54). Administrative Law Judge ("ALJ") Ann Farris conducted a hearing on October 4, 2012. AR 27-50. Ms. Rush appeared in person at the hearing with attorney representative Michael Armstrong. AR 27. The ALJ took testimony from Ms. Rush and an impartial vocational expert ("VE"), Cornelius J. Ford. AR 27-50.

On October 31, 2012, ALJ Farris issued an unfavorable decision. AR 9-22. After the Appeals Council denied review, AR 1, Ms. Rush appealed to federal court. On March 10, 2015, Magistrate Judge Stephan M. Vidmar issued a Memorandum Opinion and Order granting Ms. Rush's Motion and remanding the case for further proceedings. AR 612-20. Judge Vidmar held that ALJ Farris' evaluation of the opinion of Ms. Rush's psychiatrist, Dr. Hall, violated the treating physician rule. AR 619. "The question [for the ALJ] is not whether *Dr. Hall* showed that his opinion was well supported. The question is whether it *actually was* well-supported. The ALJ in this case made no findings suggesting that Dr. Hall's opinion was not supported." *Id.* (citations omitted). Judge Vidmar remanded for further proceedings. AR 620.

On January 20, 2016, Ms. Rush appeared and testified at a second hearing before ALJ D'Lisa Simmons. AR 716-65. She appeared with her attorney, Mr. Armstrong. AR 716. The ALJ

took testimony from Ms. Rush and an impartial vocational expert ("VE"), Mary Diane Weber. *Id.* ALJ Simmons issued an unfavorable decision on March 10, 2016 (AR 627-49). In subsequent proceedings in federal court, the Commissioner stipulated to a remand. AR 657-58. On March 6, 2017, the Appeals Council remanded to an ALJ to discuss "additional evidence submitted to the hearing office[r] prior to the issuance of the decision," including "opinions from treating sources and third party statements from friends and family." AR 661.

Ms. Rush then appeared and testified at a hearing before ALJ Stephen Gontis on November 15, 2017. AR 522-93. She was represented by William S. Rode of Michael D. Armstrong & Associates. AR 492, 522, 816. Also appearing and testifying were Medical Experts ("MEs") Stephen Goldstein M.D. and Alfred Jonas M.D., who both opined that no listing is met or equaled. AR 527-67. VE Weber testified as to the work in the national economy that a hypothetical individual could perform with Ms. Rush's limitations. AR 584-91. ALJ Gontis determined that Ms. Rush's date last insured is March 31, 2012. AR 495. He found that she was not disabled between January 5, 2008 and the date of his decision (January 16, 2018). AR 493, 512-13. The ALJ's decision is the Commissioner's final decision for purposes of judicial review pursuant to 20 C.F.R. § 404.984(a). The Court reserves discussion of the medical records relevant to this appeal for its analysis.

## II.     Applicable Law

### A.     Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also id.* § 1382(a)(3)(A) (pertaining to supplemental security income disability

benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential evaluation process ("SEP") to determine whether a person satisfies the statutory criteria as follows:

(1)    At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4)    If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)    If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the

---

[3] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

> Commissioner is able to make the required showing, the claimant is
> deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4)

(supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731

(10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

The claimant has the initial burden of establishing a disability in the first four steps of this

analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner

at step five to show that the claimant is capable of performing work in the national economy. *Id.*

A finding that the claimant is disabled or not disabled at any point in the five-step review is

conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799,

801 (10th Cir. 1991).

B.    Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless

(1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the

proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365

F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004);

*Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the

evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d

1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the

threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019). Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison

Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means—and means only—such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation

marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion," *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). But where the reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The court "should, indeed must, exercise common sense." *Id.* "The more comprehensive the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection." *Id.*

## III.  Analysis

In support of her Motion to Remand, Ms. Rush argues that the ALJ impermissibly disregarded moderate limitations assigned by a state agency non-examining consultant, Dr. Walker; improperly weighed the opinion of Dr. Hall, Ms. Rush's treating physician; and improperly weighed opinion evidence from a licensed clinical social worker. Doc. 19 at 2.

### A.  The ALJ Did Not Improperly Pick and Choose from a Consulting Doctor's Opinion.

Ms. Rush argues that the ALJ's RFC determination in this case is an improper attempt to "pick and choose" portions of a consulting doctor's opinion favorable to a non-disability finding while disregarding other portions without explaining why. Because the ALJ arrived at essentially

the same RFC as the consulting doctor, the Court rejects Ms. Rush's argument that the ALJ improperly disregarded some of his opinions.

State agency non-examining consultant Scott Walker, M.D, evaluated Ms. Rush's medical records on October 29, 2009. AR 284-88. Dr. Walker reviewed and discussed the medical evidence and, in answering questions relating to Ms. Rush's mental residual functional capacity assessment ("MRFCA"), assessed in Section I the following "moderate limitations"[4]:

- Understanding, remembering, and carrying out detailed instructions;

- Maintaining attention and concentration for extended periods of time;

- Performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerance;

- Sustaining an ordinary routine without special supervision;

- Completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;

- Interacting appropriately with the general public;

- Accepting instructions and responding appropriately to criticism from supervisors;

- Getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

- Responding appropriately to changes in the workplace.

Doc. 19 at 15; *see* AR 286-87. In his narrative in Section III, Dr. Walker found that Ms. Rush "can understand, remember, and carry out simple instructions, make simple decisions, attend and

---

[4] Dr. Walker used special Form SSA-4734-F4-SUP. That form contains three sections, one of which is a checkbox-style worksheet for rating functional limitations (Section I) and another which provides space for a narrative opinion recording the mental RFC determination (Section III).

concentrate for two hours at a time, interact adequately with coworkers and supervisors, and respond appropriately to changes in a routine work setting." AR 288.

The ALJ accorded Dr. Walker's opinion "great weight" at step four of his analysis, AR 507, and in relevant part calculated Ms. Rush's RFC as follows:

> The claimant is limited to simple, routine tasks. The claimant can interact with the public, coworkers, and supervisors no more than occasionally. The claimant can tolerate few changes in the work setting. Time off task can be accommodated by normal breaks.

AR 501.

Ms. Rush argues that the ALJ contradictorily afforded Dr. Walker's opinion "great weight," but went on to disregard, without explanation, many of the limitations he endorsed in Section I. Doc. 19 at 16-17. Specifically, Plaintiff argues that the ALJ failed to include in his RFC limitations with respect to Ms. Rush's ability to: (1) "maintain attention and concentration for extended periods of time"; (2) "perform activities within a schedule"; (3) "maintain regular attendance, and be punctual within customary tolerance"; (4) "sustain an ordinary routine without special supervision"; and (5) "complete a normal workday and workweek without interruptions from psychological[ly] based symptoms and to perform at a consistent pace without [an] unreasonable number and length of rest periods." Doc. 19 at 16-17.

Ms. Rush invokes the Tenth Circuit's holding in *Haga v. Astrue* that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." 482 F.3d 1205, 1208 (10th Cir. 2007); *see* Doc. 19 at 15. In *Haga*, a state agency examining psychological consultant reviewed the record and recommended additional testing for the claimant. 482 F.3d at 1207. The ALJ agreed and the doctor did his additional tests. *Id.* "[P]art of his detailed response was to fill out a mental RFC form, on which he marked appellant moderately impaired in seven out of ten functional

categories." *Id.* While the ALJ's RFC incorporated three of these moderate limitations, it did not incorporate the other four. *Id*. Further, the ALJ did not provide an explanation for rejecting the remaining four moderate limitations and "the evidence on which the ALJ explicitly relied in his decision [did] not imply an explanation . . . ." *Id.*

On appeal, the Tenth Circuit noted "it is simply unexplained why the ALJ adopted some of [the doctor]'s restrictions but not others." *Id.* at 1208. Although an "ALJ is entitled to resolve any conflicts in the record," the court stressed that an ALJ must actually identify the evidence that conflicts with the doctor's medical opinion or RFC assessment. *Id.* The Tenth Circuit reinforced this point later that same year when it applied *Haga* to remand where the "ALJ erred in accepting some of the moderate limitations in the Mental RFC form completed by . . . a nonexamining physician, but rejecting others without discussion." *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007).

When a doctor who assesses Section I moderate limitations also opines on a claimant's residual functioning capacity, however, the ALJ does not necessarily need to discuss each moderate limitation. This limitation of *Haga* and *Astrue*'s scope comes from the Tenth Circuit's decision in *Smith v. Colvin*, 821 F.3d 1264, 1268-69 (10th Cir. 2016). In *Smith*, the consulting doctor reviewed the claimant's records and completed a worksheet finding that she had moderate limitations in her ability to:

- maintain concentration, persistence, and pace,

- remain attentive and keep concentration for extended periods,

- work with others without getting distracted,

- complete a normal workday and workweek without interruption for psychologically based systems,

- perform at a consistent pace without excessive rest periods,

- accept instructions and respond appropriately to criticism by supervisors,

- get along with coworkers or peers without distracting them or engaging in behavioral extremes,

- respond appropriately to changes in the workplace, and

- set realistic goals or independently plan.

*Id.* at 1268.

Although the doctor found moderate limitations in nine Section I categories, in forming the claimant's mental residual functional capacity the doctor simply opined that the claimant could "(1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ, in turn, assessed that the claimant "could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks." *Id.* at 1269. The Tenth Circuit held that, although the ALJ "did not repeat the moderate limitations assessed by the doctor," affirmance was proper because the ALJ "incorporated these limitations by stating how the claimant was limited in the ability to perform work-related activities." *Id.*

*Smith* relied on *Vigil v. Colvin*, in which the court held that a claimant's moderate mental limitations in concentration, persistence, and pace were sufficiently taken into account by a restriction to unskilled work. 805 F.3d 1199, 1204 (10th Cir. 2015). The ALJ in *Vigil* found that the claimant was moderately limited in the ability to maintain concentration for extended periods. *Id.* at 1203. But the ALJ further found that the claimant "retained enough memory and concentration to perform at least simple tasks." *Id.* at 1203-04 (alteration omitted). Because the limitation was "not critical" to the performance of unskilled work, the ALJ's RFC appropriately

accounted for claimant's limitations. *Id* at 1204. In particular, "limiting the plaintiff to an SVP[5] of only one or two[] adequately took into account his moderate limitations in concentration, persistence, and pace." *Id.*

*Smith* also favorably cited an unpublished case, *Lee v. Colvin*, 631 F. App'x 538 (10th Cir. 2015). In *Lee*, the ALJ adopted, "essentially verbatim, the limitations from Section III of the MRFCA." *Id.* at 541. The court held that "[h]aving adopted the limitations described in section III of the MRFCA, the ALJ was not also required to specifically adopt or discuss each individual limitation described in section I." *Id.* Other unpublished opinions from the Tenth Circuit have affirmed the ALJ based on similar reasoning. *See, e.g.*, *Nelson v. Colvin*, 655 F. App'x 626, 629 (10th Cir. 2016); *Fulton v. Colvin*, 631 F. App'x 498, 502 (10th Cir. 2015).

Finally, the Tenth Circuit in *Smith* expressly stated that asking "how the administrative law judge's assessment incorporates the numerous moderate limitations indicated by [the doctor] . . . is the wrong question." 821 F.3d at 1269 n.2. The doctor's Section I notations, the Tenth Circuit explained, "serve[] only as an aid to her assessment of residual functional capacity." *Id.* The reviewing court is to "compare the administrative law judge's findings to [the doctor]'s opinion on residual functional capacity, not her notations of moderate limitations." *Id.*

The implications of this reasoning can best be understood by examining one of the Section I limitations discussed in *Smith*: a "moderate" limitation in the ability to "work with

---

[5] The specific vocational preparation ("SVP") "refers to the 'time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil*, 805 F.3d at 1201 n.2 (quoting the Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991), 1991 WL 688702 (G.P.O.)). "A job at SVP one requires 'a short demonstration only' and at SVP two requires 'anything beyond a short demonstration up to and including 1 month.'" *Id.* "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3.

others without getting distracted." *Id.* at 1268. Unlike the situation in *Vigil*, the absence of

discussion about this moderate limitation in the ALJ's decision cannot be accounted for by

simply limiting a claimant to unskilled work. This is because the ability to "work in coordination

with or proximity to others without being (unduly) distracted by them" is "critical for performing

unskilled work." POMS § DI 25020.010, § B(3)(g).[6] Yet, even though the ALJ never discussed

this moderate limitation and this moderate limitation cannot be accounted for through the

limitation of the claimant to unskilled work, the Tenth Circuit in *Smith* rejected the claimant's

argument that the ALJ's failure to address this moderate limitation constituted error.

Given that moderate limitations matter (*Haga*, 482 F.3d at 1208, made clear that "a

moderate impairment is not the same as no impairment at all"), the question arises as to when the

absence of ALJ discussion about a Section I moderate limitation requires remand (as in *Haga*

and *Frantz*) and when the absence of ALJ discussion about a Section I moderate limitation

constitutes no error. One situation that constitutes no error is when the ALJ justifiably gives the

doctor's opinion little to no weight. SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law

judges and the Appeals Council are not bound by findings made by State agency or other

program physicians and psychologists, but they may not ignore these opinions and must explain

the weight given to the opinions in their decisions."). *Vigil* makes clear that another situation is

when the assignment to unskilled work incorporates or otherwise accounts for the Section I

moderate limitation. *Smith* demonstrates that yet another situation is when the doctor who

---

[6] The Social Security Administration Program Operations Manual System ("POMS") is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999). The reviewing court will defer to the POMS provisions unless they are arbitrary, capricious, or contrary to law. *Ramey v. Reinertson*, 268 F.3d 955, 964 n.2 (10th Cir. 2001); *see also Vigil*, 805 F.3d at 1204 (relying on the POMS' definition of unskilled work).

assessed the Section I moderate limitation has also reached an opinion on residual functional capacity in his or her Section III/narrative discussion, which the ALJ then accepts.

In this respect, *Smith* deviated from unpublished Tenth Circuit cases that called for the consulting doctor to carefully adhere to Section I worksheet limitations when fashioning a narrative RFC. For example, in *Carver v. Colvin*, the Tenth Circuit held that an ALJ may not "turn a blind eye to moderate Section I limitations," and "[i]f a consultant's Section III narrative fails to describe the effect that each of the Section I moderate limitations would have on the claimant's ability, or if it contradicts limitations marked in Section I, the MRFCA cannot properly be considered part of the substantial evidence supporting an ALJ's RFC finding." 600 F. App'x 616, 619 (10th Cir. 2015).[7]

As Ms. Rush notes in her reply brief, other judges in this District have declined to follow *Smith* on the ground that it is inconsistent with *Haga* and *Frantz*, and one panel of the Tenth Circuit cannot overrule another panel. *See, e.g.*, *Cordova v. Berryhill*, No. 17-cv-611-SMV, 2018 WL 2138647, at *7 (D.N.M. May 9, 2018); *Jones v. Berryhill*, No. 15-cv-842-LF, 2017 WL 3052748, at *5 n.6 (D.N.M. June 15, 2017); Doc. 27 at 2. This Court does not agree that these cases are irreconcilable. *Haga* and *Frantz* continue to stand for the proposition that "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." 482 F.3d at 1208. But they do not specify what exactly constitutes the doctor's ultimate "opinion" when a doctor has checked boxes on a form

---

[7] Ms. Rush cites previous opinions by this Court which similarly held that a consulting physician must account for all worksheet moderate limitations in his narrative RFC, and the ALJ may not overlook inconsistencies between the two. Doc. 19 at 17-18; *Chavez v. Colvin*, No. 14-1067 SCY, 2016 WL 10179283, at *6 (D.N.M. July 8, 2016); *Vamvakerides v. Colvin*, No. 14-00897 SCY, 2016 WL 10538097, at *6-7 (D.N.M. Apr. 7, 2016). On further consideration, as explained above, cases like *Chavez*, *Vamvakerides*, and *Carver* cannot be reconciled with the published Tenth Circuit opinion in *Smith*.

(Section I), the significance of which is then clarified through the doctor's narrative opinion about a claimant's RFC (Section III). Unlike in *Smith*, the panels in *Haga* and *Frantz* did not consider a doctor's narrative RFC opinion and so had no occasion to opine about how Section I moderate limitations should be evaluated in light of a doctor's narrative RFC opinion.

*Haga* and *Frantz* therefore did not address the question *Smith* answers—whether an ALJ is permitted to rely on the doctor's ultimate opinion as expressed in the narrative RFC, when that RFC does not exactly match the doctor's own Section I worksheet limitations. As *Smith* explains, the doctor need not make sure the narrative and the worksheet exactly match. When the doctor fashions an RFC in his narrative opinion, that controls over any moderate worksheet limitations because the worksheet serves as an "aid" to an opinion and is not the opinion itself. *Smith*, 821 F.3d at 1269 n.2.

Based on *Smith*, the Court rejects Ms. Rush's argument that, once the ALJ gave great weight to Dr. Walker's opinion, the ALJ was required to either adopt Dr. Walker's Section I moderate limitations or, for each moderate limitation, explain why he did not adopt that limitation. *Smith* mandates affirmance here because the doctor's narrative RFC and the ALJ's RFC are consistent. In his narrative, Dr. Walker opined that Ms. Rush "can understand, remember, and carry out simple instructions [and] make simple decisions" and the ALJ found that she "is limited to simple, routine tasks." AR 288, 501. Dr. Walker opined that Ms. Rush can "attend and concentrate for two hours at a time" and the ALJ found that her "[t]ime off task can be accommodated by normal breaks."[8] *Id.* Dr. Walker found that Ms. Rush can "interact adequately with coworkers and supervisors" and the ALJ found that she "can interact with the

---

[8] "Normal breaks" is consistent with the requirement to concentrate for "the approximately 2-hour segments between arrival and first break, lunch, second break, and departure." POMS § DI 25020.010, § B(2)(a).

public, coworkers, and supervisors no more than occasionally." *Id.* And finally, Dr. Walker

found that she can "respond appropriately to changes in a routine work setting," while the ALJ

found that she "can tolerate few changes in the work setting." *Id.* Demonstrably, these opinions

are virtually identical. And where they are not identical, the ALJ's RFC is *more* restrictive than

Dr. Walker's. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (it is not error

for the ALJ to have "developed a mental RFC consistent with [a consultative examiner]'s

findings in some areas but more favorable" to the claimant in other areas).

 Thus, even though the ALJ did not discuss all of Dr. Walker's Section I moderate

limitations, he did not commit error.

### B.     The ALJ Properly Weighed the Opinion of Dr. E.B. Hall, M.D.

The ALJ is required to evaluate every medical opinion he receives that could have an

effect on the RFC. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161-62 (10th Cir. 2012); *Doyal v.

Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003). For claims filed before March 27, 2017,[9] as the

present claim is, medical opinions are classified into two different categories: "acceptable

medical sources" and "other sources." "Acceptable medical sources" are licensed physicians,

licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified

speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL

3928298. A unique two-step rule applies to the opinions of treating physicians (acceptable

medical sources who provide or have provided the claimant with medical treatment and who

have an ongoing relationship with the claimant). First, the ALJ must determine whether the

---

[9] For claims filed on or after March 27, 2017, all medical sources can provide evidence that is
categorized and considered as medical opinion evidence and subject to the same standard of
review. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg.
5844 (Jan. 18, 2017).

opinion is entitled to "controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.

2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is

both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques";

and (2) "consistent with other substantial evidence in the record." *Id.* (internal quotation marks

omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to

controlling weight." *Id.* If it is not given controlling weight, "at the second step in the analysis,

the ALJ must make clear how much weight the opinion is being given (including whether it is

being rejected outright) and give good reasons, tied to the factors specified in the cited

regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.[10]

The ALJ is not, however, required to "apply expressly each of the six relevant factors in

deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th

Cir. 2007). Rather, the decision need only be "sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight." *Id.* (internal quotation marks omitted). The Tenth Circuit has

also expressed this as a requirement that the ALJ provide "specific and legitimate reasons" for

rejecting an opinion. *Doyal*, 331 F.3d at 764; *Watkins*, 350 F.3d at 1301. The ALJ's reasons are

reviewed for substantial evidence. *Doyal*, 331 F.3d at 764.

---

[10] Prior to March 27, 2017, the factors in the regulation were: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)).

In this case, Ms. Rush argues that the ALJ improperly weighed functional assessments completed by her treating psychiatrist, Dr. Hall, in 2010 and 2016. Doc. 19 at 19. Dr. Hall completed a Medical Assessment of Ability to do Work-Related Activities (Mental) ("MSS") on August 31, 2010. AR 441-42. He considered Ms. Rush's medical history from a year prior to her initial visit, which was sometime in April 2008, AR 285, to the current date of August 31, 2010. AR 441. On March 2, 2016, Dr. Hall completed another MSS which considered Ms. Rush's medical history from 2012 to the current date. AR 1302-03.

The ALJ found that "Dr. Hall's opinion as set out in [the MSS] forms is not entitled to controlling weight." AR 509. "It is not well supported by medically acceptable clinical and laboratory diagnostic techniques and it is inconsistent with the other substantial evidence in the case record." *Id.* "[H]aving considered the factors set out in 20 CFR 404.1527 . . . I find that his opinion is entitled to limited weight." *Id.* The ALJ acknowledged that Dr. Hall is Ms. Rush's "long time treating psychiatrist" and that "his opinion is about his area of specialty." *Id.* But the ALJ provided three specific reasons for assigning the opinion limited weight: (1) "there are internal inconsistencies in the forms" as well as inconsistencies between Dr. Hall's opinion and "other substantial evidence in the case record"; (2) "Dr. Hall's treatment notes do not provide evidence to support his opinion"; and (3) "neuropsychological testing does not support his opinion." *Id.* Further, the ALJ wrote several paragraphs providing the foundation for each of these three reasons. As set forth more fully below, the Court concludes that the ALJ's decision to give Dr. Hall's opinion limited weight based on these three reasons is supported by substantial evidence.

1. <u>Inconsistencies</u>

The ALJ first identified Dr. Hall's own forms as internally inconsistent. Specifically, Dr. Hall completed a mental residual functional capacity assessment form ("MRFCA") that

instructed Dr. Hall to give "an assessment of how the patient's mental/emotional capabilities are affected by the impairment(s)." AR 441. The form is broken down into the familiar nonexertional categories (understanding and memory; sustained concentration and persistence; social interaction; and adaptation). AR 441-42. Under "concentration and persistence," Dr. Hall assessed one "slight" limitation, two "marked" limitations, and four "moderate" limitations. AR 442. However, on the same day, Dr. Hall completed a form for the listing criteria for 12.04, Affective Disorders. AR 444. In that form, he assessed that Ms. Rush has "marked difficulties in maintaining concentration, persistence, or pace." *Id.* The ALJ noted the same inconsistencies— that the MRFCA predominantly contained limitations that were moderate or less, while the listing forms indicated only a marked limitation—in the 2016 forms. AR 509; *see* AR 1303-04.

Similarly, the ALJ noted that Dr. Hall's assessment for social functioning on the 2010 MRFCA form differed from Dr. Hall's assessment for social functioning on the 2010 listing form. In assessing the social interaction portion of the MRFCA, Dr. Hall found three "slight" limitations, two "moderate" limitations, and no "marked" limitations, AR 442. On the listing criteria form, however, Dr. Hall assessed "marked" difficulties in maintaining social functioning. AR 444. The ALJ noted the same inconsistencies in the 2016 forms. AR 509; *see* AR 1303-04.

Ms. Rush argues that the ALJ's decision to reduce the weight given to Dr. Hall based on the ALJ's determination of inconsistencies in these forms is wrong for two reasons. First, she asserts that "the forms do not convey the same information. They were constructed by different parties, for different purposes, and in different areas." Doc. 19 at 20. Ms. Rush, however, cites no authority in support of her contention that an ALJ should not compare information on the two forms. Moreover, while the forms may have been constructed for different purposes, the forms request similar information about a claimant's mental capabilities. To the extent a doctor

provides conflicting information about a claimant's mental capabilities, it logically seems appropriate for the ALJ to consider this conflicting information when determining how much weight to give that doctor's opinion. Indeed, the regulations instruct that an ALJ should consider inconsistencies in the record. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007).

Second, Ms. Rush argues that the assessments on the forms are not in conflict. She asserts that the listing forms cover "broad categories" (such as activities of daily living, social functioning, and concentration, persistence and pace), whereas the MRFCA "breaks down those areas into 20 activities within the categories." Doc. 19 at 20. Ms. Rush then argues that the limitations in activities Dr. Hall found on the MRFCA, when combined, support the marked limitations in broad categories that Dr. Hall found Plaintiff to have on the listing forms. *Id.* at 20-21.

Given the deferential substantial-evidence standard the Court must apply when reviewing an ALJ's decision, had the ALJ determined that the listing forms were not inconsistent with the MRFCA form, Ms. Rush's reasoning might support such a conclusion. But the ALJ concluded the opposite, and this opposite conclusion is also subject to the deferential substantial-evidence standard. *Biestek*, 139 S. Ct. at 1156; *Pisciotta*, 500 F.3d at 1078. Instead of conducting a de novo review of the ALJ's findings, the Court must determine whether his findings are supported by "more than a mere scintilla" of evidence. *Biestek*, 139 S. Ct. at 1154. In doing so, the Court must ask whether the ALJ has identified an internal discrepancy that is "seemingly" inconsistent. *Pisciotta*, 500 F.3d at 1078. The Court answers this question in the affirmative. With regard to social interaction in particular, the record shows that Dr. Hall stated on one form that Ms. Rush has only slight to moderate limitations but then on a separate form he filled out the same day

concluded that she is markedly limited. This is "seemingly inconsistent," as the ALJ explained at length.

Nor are these reports the only records that support the ALJ's finding of inconsistency in Dr. Hall's reports. The ALJ also found Dr. Hall made assessments inconsistent with the overall record when Dr. Hall opined that Ms. Rush "experienced 'repeated episodes of decompensation, each of extended duration,'" despite no evidence that Ms. Rush had ever been hospitalized or required inpatient treatment except for her one visit to the ER for anxiety. AR 509; *see* AR 439, 440, 444. "'Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation.'" *Davison v. Colvin*, 596 F. App'x 675, 678 (10th Cir. 2014) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4)). "They 'may be inferred from medical records showing significant alteration in medication or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household).'" *Id.* (alterations omitted). "[T]he listings define the term 'repeated episodes of decompensation, each of extended duration' as 'three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.'" *Id.* Therefore, while hospitalization is not necessarily required to demonstrate this listing criterion, it is certainly relevant. *Id.* The burden is on the claimant to present evidence of episodes of decompensation lasting more than two weeks. *Id.* Nonetheless, Ms. Rush points to no evidence of episodes of decompensation lasting more than two weeks that could have supported Dr. Hall's opinion. This seeming inconsistency between Dr. Hall's medical opinion and the record as a whole further supports the ALJ's decision to discount the weight he gave to Dr. Hall's opinions. Accordingly, the Court finds no error in the ALJ's decision to discount Dr. Hall's opinion.

## 2. Unsupported by treatment notes

The ALJ found that Dr. Hall's own contemporaneous treatment notes failed to support the limitations he found. The ALJ's discussion of Dr. Hall's treatment notes divided them into two different categories: treatment notes before September 26, 2012, which largely consisted of medication prescription orders and handwritten descriptions of the patient's subjective symptom evidence, AR 509-10; and treatment notes after 2013, which include mental status examination findings and psychomotor testing, AR 510.

Ms. Rush objects that the ALJ cannot reject a treating physician's opinion simply because he relied on subjective evidence from the patient. Doc. 19 at 21. Ms. Rush misses the point. The ALJ did not criticize Dr. Hall for relying on subjective evidence from Ms. Rush; the ALJ simply found that his notes prior to 2013 included no objective findings. AR 509-10. The record supports this finding. AR 270-85, 360-61, 363-88, 393-99, 447-80. Indeed, the ALJ was *required* to evaluate whether Dr. Hall's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ's observation that, prior to 2012, Dr. Hall documented *no* clinical or diagnostic testing, then, is highly relevant to whether Dr. Hall's opinion is entitled to controlling weight. *E.g.*, *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001), *as amended on denial of reh'g* (Apr. 5, 2002).

The ALJ's finding that Dr. Hall's opinion is contradicted by his own clinical examinations after 2013 is supported by substantial evidence, which the ALJ cited. AR 510. In March 2013, Dr. Hall assessed Ms. Rush's mental status as normal/unremarkable, including intact memory, concentration, and attention. AR 1044-46. Her mood was euthymic, her mood congruent, and her thought process was goal directed. AR 1045. He commented that Ms. Rush's ADD, "low motivation," and "depression" were being "managed" by medication. AR 1045. In

July, she presented as "mostly stable." AR 1040-43. Her mental status examination was normal/ unremarkable except that her mood was sad/depressed. AR 1041. Her thought content was not abnormal, and her judgment, memory, concentration, and attention were intact. AR 1041. In October, she was "doing well on medications" and the mental status examination was normal. AR 1036-39. Her thought content was not abnormal, and her judgment, memory, concentration, and attention were intact. AR 1037.

In January 2014, she again presented as mostly stable and her mental status examination was normal, including intact judgment, memory, concentration, and attention. AR 1030-35. Her mood and affect were sad/depressed. AR 1033. In April, her sleep and appetite were stable, she had increased focus and concentration, her mood lifted, her tremors had stopped, and her mental status exam was normal, but her mood was sad/depressed. AR 1025-29. Her judgment, memory, concentration, and attention were intact. AR 1026. In August, the only clinical note was that her medications were tolerated, and no changes were needed. AR 1020-24. In September, Dr. Hall noted "much improvement" and good insight and interaction, and her mental status exam was normal. AR 1016-19. Her judgment, memory, concentration, and attention were intact. AR 1017. In December, her current medication was tolerated, her focus was improved, she was less irritable and anxious and more goal oriented. AR 1011-15. Her mental status exam was normal, including intact judgment, memory, concentration, and attention. AR 1012.

In March 2015, Dr. Hall noted she was anxious and depressed, and her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. AR 1006-10. Her judgment, memory, concentration, and attention were intact. AR 1007. In June, the only clinical note was that Ms. Rush requested medication refills, and her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. AR 1001-05. Her judgment, memory, concentration,

and attention were intact. AR 1002. In October, he noted that her depression "comes and goes" and she was frightened by surgery and struggled with fatigue. AR 996-1000. Her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. Her judgment, memory, concentration, and attention were intact. AR 997. In December, she felt horrible and unhappy and she experienced "lots of anxiety and panic attacks." AR 1402-06. Her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. Her judgment, memory, concentration, and attention were intact. AR 1043.

In March 2016, Dr. Hall discussed his clinical findings ranging from Ms. Rush's "hoarding" to her concentration, movements, irrational fears, and interacting hypervigilance. He noted she had previously presented to the ER for "panic." He also noted she brought in "paperwork for disability." AR 1397-1401. The mental status exam continued to reveal normal findings, but he noted her mood was sad/depressed/fearful/anxious. Her judgment, memory, concentration, and attention were intact. AR 1398. By July, Ms. Rush's symptoms were again "well controlled" with medication and she was able to concentrate and complete tasks. AR 1391-96. Her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. Her judgment, memory, concentration, and attention were intact. AR 1392. In early November, her anxiety was less and she wanted to make changes. AR 1386-90. Her mental status exam was normal, including intact memory, concentration, and attention. AR 1387. In late November, Dr. Hall noted both that she was experiencing "increased anxiety" but also that her "anxiety and discontinuation symptoms are now much less." AR 1375-79. Her mental status exam was normal, including intact memory, concentration, and attention. AR 1377. In December, he found that her depression was inadequately controlled and her anxiety partially managed. AR 1368-74. The mental status exam noted she was sad/depressed/fearful/anxious and that her thought

processes were tangential, circumstantial/hopeless, and she exhibited poor confidence and ruminations. Her memory, judgment, concentration, and attention were intact. AR 1370. In July of 2017, she was again "doing much better"; her "situation [wa]s improved"; and her mental status exam was normal, but her mood was sad/depressed/fearful/anxious. AR 1362-67. Her judgment, memory, concentration, and attention were intact. AR 1363.

In sum, it was not error for the ALJ to determine that Dr. Hall's treating records fail to support his assessment that Ms. Rush is markedly limited in many areas of mental functioning. Dr. Hall consistently documented that the results of the mental status exams were normal or unremarkable. As the ALJ carefully noted, Ms. Rush's memory, attention, and concentration (mental status) as well as her gait and station (psychomotor functioning) were consistently intact/normal. AR 510-11; *see* AR 997, 1002, 1007, 1026, 1033, 1041, 1363, 1370, 1392, 1398, 1403. Her symptoms fluctuated as did her moods, but she was on a stable, routine medication regimen and Dr. Hall never recommended more intensive psychiatric treatment. AR 510.

The Tenth Circuit has repeatedly affirmed an ALJ's rejection of treating psychiatrist's opinion under similar circumstances. In *DeFalco-Miller v. Colvin*, the court found that the ALJ properly gave little weight to a treating physician's opinion where the physician's treatment notes "reported no abnormal findings or only a depressed mood or periodic situational depression," and where the physician "repeatedly found no psychotic episodes." 520 F. App'x 741, 746 (10th Cir. 2013). The court also accepted the ALJ's observation that the psychiatrist's "course of treatment" for the claimant "belied" his "opined limitations." *Id.* "The record indicates that [claimant] saw [psychiatrist] roughly fourteen times over a forty-three month period primarily to adjust her medications . . . ." *Id.* at 747. The psychiatrist "did not pursue more invasive treatment options." *Id.* "Yet he signed off on the RFC form, agreeing . . . that [claimant]

had marked or extreme limitations in every area." *Id.* "The course of [claimant]'s treatment, however, casts doubt on those limitations." *Id.*

Similarly, in *Beasley v. Colvin*, the court found that the ALJ properly rejected the treating psychiatrist's opinion where his treatment records "did occasionally note that [claimant]'s mood was dysphoric and her affect was sad and tearful, but his records do not include findings that [claimant] exhibited or was experiencing significant functional limitations caused by her mental impairment." 520 F. App'x 748, 752 (10th Cir. 2013). "The majority of [the psychiatrist]'s treatment records reflect that on mental status examination [claimant] was 'pleasant and cooperative' and exhibited relatively stable somatic functions, normal motor activity, and 'no acute psychotic symptoms.'" *Id.* (alterations omitted).

In *Dixon v. Colvin*, the court affirmed the ALJ's observation that the assignment of "extreme limitations appears in some tension with the limited mental health treatment [the same doctor] prescribed." 556 F. App'x 681, 683 (10th Cir. 2014). First, the court observed that the claimant "saw a therapist once or twice a month; received monthly prescription refills; and worked with counselors to deal with anger management, sleep difficulties, and mood swings." *Id.* As the ALJ remarked, such treatment is "fairly conservative." *Id.* Second, the court agreed that the treating physician's opinion was inconsistent with his own treatment notes, which at least once indicated that the doctor thought the claimant was not disabled as a result of her mental health conditions. *Id.* The Tenth Circuit found that these two grounds, standing alone, were sufficient to affirm the ALJ's rejection of a treating physician's opinion. *Id.* at 682-83.

In *Arterberry v. Berryhill*, the Tenth Circuit affirmed where "[s]ubstantial evidence supports the ALJ's observation that [the treating physician]'s defined limitations were not consistent with the medical evidence, including his own mental examinations," and "the ALJ

accurately noted that [the treating physician]'s treatment plan was limited to medication management." 743 F. App'x 227, 229 (10th Cir. 2018). And a few months later, in *Adcock v. Commissioner*, the Tenth Circuit affirmed the limited weight assigned to a treating psychologist's opinion on the claimant's "functional limitations." 748 F. App'x 842, 846 (10th Cir. 2018). The court explained that "there is evidence—including notes from Dr. Speer—that indicates her medications were helpful; she was oriented; she exhibited no signs of psychosis or mania; her behavior, speech, and affect were appropriate or unremarkable; and she was cooperative. Other notes from Dr. Isabel Vega indicate that she had insight and good judgment, normal mood and affect, was active and alert, oriented to time, place, and person, and had normal recent and remote memory." *Id.* (citations omitted). "The ALJ also observed that there was no evidence of repeated episodes of decompensation lasting for extended duration." *Id.* The court "conclude[d] the ALJ properly evaluated the medical source evidence." *Id.*

The Court adopts the reasoning of these unpublished opinions as persuasive. The ALJ's discussion of Ms. Rush's treatment records is extensive and substantial evidence supports his finding that Dr. Hall's opinion is undermined by his own clinical findings and prescribed course of treatment. AR 509-10.

### 3. Neuropsychological testing

The ALJ's final reason for assigning Dr. Hall's opinion limited weight involves another inconsistency with the record as a whole. Dr. Hall's MRFCA in 2016 assigned Ms. Rush "marked" limitations in her ability to understand and remember instructions, both detailed and simple. AR 510. Neuropsychological testing, however, revealed in 2010 and 2017 that Ms. Rush "was functioning in the average range of intellectual ability, and performed in the average range of the Wechsler Memory Scale-Revised, indicating no major memory problems." AR 510; *see* AR 314-22 (2010 testing report); AR 1312-23 (2017 testing report).

Ms. Rush does not specifically address this reason the ALJ gave for his rejection of Dr. Hall's opinion. She asserts elsewhere in her brief, however, that the results of the 2010 testing, performed by Dr. Barbara Koltuska-Haskin, Ph.D., were "invalid" because Ms. Rush was "faking good," likely because CYFD ordered the test and Ms. Rush did not want to lose child custody. Doc. 19 at 13 & n.10. It is true that Dr. Koltuska-Haskin found, with respect to the *personality* test she administered to Ms. Rush, that "[i]t was a so-called 'faking good' profile, which indicates that she was generally denying symptoms and problems and was attempting to appear better off psychologically than was, in fact, the case." AR 319. "This is probably related to CYFD involvement in her case." *Id.* The *memory* test administered by Dr. Koltuska-Haskin, however, was not subject to any finding of invalidity. AR 318-19 ("Ms. Rush performed in the average range on the Wechsler Memory Scale-Revised (WMS-R), which indicates no major memory problems. Her reported 'difficulty remembering' is probably related to her compromised attention/concentration skills compounded by emotional problems."). Thus, Dr. Koltuska-Haskin's neuropsychological testing, which revealed no memory problems, remains substantial evidence supporting the ALJ's decision. Furthermore, Ms. Rush does not offer any arguments to disregard the 2017 test results. *See* Doc. 19 at 14; AR 1317 (memory skills were "generally intact" and "within the expected range").

As the Commissioner points out, "an ALJ may consider other medical opinion evidence in rejecting the opinion of a treating physician." Doc. 26 at 19 (citing *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988)); *see also Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004) (inconsistency with "other substantial evidence in the record" is a "facially valid reason" for not according controlling weight to a treating physician's opinion); *Romo v. Comm'r, Soc. Sec. Admin.*, 748 F. App'x 182, 186 (10th Cir. 2018) ("It is true that an ALJ should, in general,

give greater weight to the opinion of a treating physician than to that of a consultant or non-examining physician, but in appropriate circumstances, opinions from State agency medical and psychological consultants may be entitled to greater weight than the opinions of treating or examining sources" based on the "complete case record" (internal alterations, citations, and quotation marks omitted)). Combined with the ALJ's other stated reasons, the Court affirms the ALJ's assignment of little weight to Dr. Hall's opinion.

C.    The ALJ Properly Weighed the Opinion of Therapist Stacey Maggard, LCSW.

Ms. Rush's final argument contests the ALJ's treatment of the opinion of her therapist. Stacey Maggard, a licensed clinical social worker ("LCSW"), completed medical assessments of Ms. Rush's ability to do work-related activities dated January 5, 2016 and October 18, 2017. In each, she found that Ms. Rush suffers from limitations in all areas of mental functioning (understanding and memory; sustained concentration and persistence; social interaction; and adaptation). AR 1266-67, 1497-98. Her assessment included a few slight, some moderate, and mostly marked limitations. *Id.* The ALJ assigned these opinions "limited weight" because "her opinion regarding functional limitations is not consistent with other evidence." AR 510. The ALJ noted, in language echoing his rejection of Dr. Hall's opinion, that LCSW Maggard assigned Ms. Rush "marked" limitations in her ability to understand and remember instructions, but neuropsychological testing in 2010 and 2017 revealed that Ms. Rush's memory and intellectual abilities are within the average range. AR 510.

LCSW Maggard is an "other medical source."[11] The Administration's regulations

_____

[11] For claims filed before March 27, 2017, "other medical sources" are defined as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298. "Acceptable medical sources" are licensed physicians, licensed or certified

contemplate the use of information from "other sources," both medical and non-medical, "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. § 416.902); *see* SSR 06-03p, 2006 WL 2329939, at *2. An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6; *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012). "In the case of a nonacceptable medical source like [Ms. Maggard], the ALJ's decision is sufficient if it permits [the court] to 'follow the adjudicator's reasoning.'" *Keyes-Zachary*, 695 F.3d at 1164 (quoting SSR 06-03p, 2006 WL 2329939, at *6).

Ms. Rush argues that the ALJ may not disregard LCSW Maggard's opinion on the basis that she is not an "acceptable medical source." Doc. 19 at 22-23. The Commissioner contends that the ALJ merely recognized the category the opinion belongs in and did not reject LCSW Maggard's opinion on the sole basis that she is not a physician. Doc. 26 at 20. The Court agrees with the Commissioner. The ALJ recognized that LCSW Maggard is an "other medical source," and cited inconsistencies with other evidence as his reason for the weight given to her opinion (citing a specific example related to neuropsychological testing). AR 510. The ALJ's finding is

psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

For claims filed on or after March 27, 2017, all medical sources can provide evidence that is categorized and considered as medical opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

further supported by his lengthy summary of the entire medical record. AR 501-11. In relevant part, the ALJ concluded that evidence showed that

> the claimant has not experienced a seizure since 2006, even though she stopped taking Keppra on her own; physical examinations since 2008 that have shown no neurological deficits and have generally been unremarkable, apart from acute but temporary problems after she injured her left ankle and later her right heel; neuropsychological testing in 2010 and 2017 showing intellectual functioning in the average range and performance in the average range of the Wechsler Memory Scale-Revised, indicating no major memory problems; Dr. Hall's progress notes consistently showing intact memory, attention, and concentration; the testimony of medical expert Dr. Goldstein that the claimant can perform light work with seizure precautions; and the testimony of psychiatrist Dr. Jonas regarding the claimant's mental capacities.

AR 511.[12]

In her motion, Ms. Rush does not dispute that the ALJ identified inconsistencies between LCSW Maggard's opinion and other medical evidence in the record. Ms. Rush merely argues that LCSW Maggard's opinion is consistent with the opinions of Dr. Walker, Dr. Hall, and Dr. Russo. Doc. 19 at 24-25. But as discussed above, the relevant opinion of Dr. Walker is not that Ms. Rush has a host of "moderate limitations" which would prevent her from doing unskilled work. His opinion is that Ms. Rush "can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with coworkers and supervisors, and respond appropriately to changes in a routine work setting." AR 288. The ALJ gave "great weight" to this opinion and, as discussed above, either incorporated every one of these restrictions into his RFC or developed an even more restrictive limitation. Also as discussed above, Dr. Hall's functional limitation assessment was

---

[12] Procedurally, the ALJ is not necessarily required to discuss this evidence on the same page or in the same paragraph that he discusses LSCW Maggard's opinion. *Webb v. Comm'r, Soc. Sec. Admin.*, 750 F. App'x 718, 721 (10th Cir. 2018) ("relying on those other medical opinions, which are all discussed earlier in the decision (and thus are apparent from the ALJ's decision itself), does not constitute an impermissible post hoc justification").

internally inconsistent, unsupported by Dr. Hall's own treatment records, and unsupported by other evidence of record. The ALJ was not required to rely on it.

In contrast, the record contains substantial evidence that contradicts LCSW Maggard's opinion: the opinions of state agency consultants; clinical notes from the treating psychiatrist; live testimony from consulting physicians appearing at the hearing before the ALJ; and objective neuropsychological testing. AR 501-11. Because it is inconsistent with this evidence of record, the ALJ committed no error in assigning limited weight to LCSW Maggard's opinion. *See Keyes-Zachary*, 695 F.3d at 1164-65 (contradictory opinion evidence from an acceptable medical source "alone" justifies rejection of a non-acceptable medical source); SSR 06-03, 2006 WL 2329939, at *1 (Aug. 9, 2006) (designation as a non-acceptable medical source "may justify" giving an opinion of an acceptable medical source "greater weight"); *Luttrell v. Astrue*, 453 F. App'x 786, 791 (10th Cir. 2011) ("extensive cognitive and psychological testing" performed by an acceptable medical source is "more probative" than a counselor's assessment).

## IV.    Conclusion

For the reasons stated above, Ms. Rush's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 19) is **DENIED.**


**STEVEN C. YARBROUGH**
**United States Magistrate Judge**
**Presiding by Consent**